# Exhibit 2

# Taylor's State Court Complaint

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
ROBERT TAYLOR, individually and derivatively on behalf of
BLUE TREE MANAGEMENT LLC,

                   Index No.

      Plaintiff,

  -against-              **SUMMONS**

ANIELLO ZAMPELLA, CHAD RUSSO, PIERRE BASMAJI,
and COTTONWOOD VENDING LLC,

      Defendants,

BLUE TREE MANAGEMENT LLC

      Nominal Defendant.
-----------------------------------------------------------------------x

**TO THE ABOVE-NAMED DEFENDANTS:**

  **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer on Plaintiff's attorney within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete, if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

  Plaintiff designates New York County as the place of trial. Venue is proper in this Court because one or more of the parties reside in New York County.

Dated: New York, New York
    February 22, 2022

                   **TUTTLE YICK LLP**

             By: /s/ Gregory O. Tuttle
                Gregory O. Tuttle
                David G. Skillman
                352 Seventh Avenue, 14th Floor
                New York, New York 10001
                (646) 833-0300

                *Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------x
ROBERT TAYLOR, individually and derivatively on
behalf of BLUE TREE MANAGEMENT LLC,

                Index No.

        Plaintiff,

    -against-                  **COMPLAINT**

ANIELLO ZAMPELLA, CHAD RUSSO, PIERRE
BASMAJI, and COTTONWOOD VENDING LLC,

        Defendants,

BLUE TREE MANAGEMENT LLC

        Nominal Defendant.
------------------------------------------------------------------------x

Plaintiff Robert Taylor, individually and derivatively on behalf of Blue Tree Management LLC ("Blue Tree"), by his attorneys, Tuttle Yick LLP, for their Complaint herein, alleges against defendants Aniello Zampella, Chad Russo, Pierre Basmaji, Abbas Baig and Cottonwood Vending LLC ("**Cottonwood**") as follows:

## OVERVIEW

1. Defendants promised Taylor a one-third interest in their highly profitable joint venture to acquire and manage automated teller machines for virtual currency. Instead, they booted him out of the business and refused to pay him a dollar.

2. In 2014 and 2015, Taylor, an early entrepreneur in the cryptocurrency space, began installing some of the first automated teller machines selling Bitcoin ("**BTMs**") in New York City.

3. When the New York State Department of Financial Services made clear that individuals or companies operating BTMs must obtain a "BitLicense" to engage in the receipt or transmission of virtual currency, Taylor began looking for partners more familiar with that process.

4. So when Taylor met virtual currency traders Zampella and Russo through a mutual contact, it seemed like a perfect match.

5. Taylor brought know-how, experience, his early-to-market physical BTMs, lease agreements to the spaces where the BTMs were operating, and a developed customer base. Zampella and Russo brought capital and a wealth of resources in the industry, and Zampella had already started the process of obtaining a BitLicense.

6. So the three came to an agreement over several conversations and written communications. They would form a joint venture called CoinBTM, which would acquire, install and operate BTMs in New York City and elsewhere. Zampella and Russo also insisted that attorney Pierre Basmaji be in-house counsel and compliance officer for, and a minority partner in, the joint venture.

7. Zampella, Russo, and Taylor agreed to split CoinBTM's profits into equal one-third interests distributed quarterly.

8. While Zampella and Russo agreed that the three partners would each own a third of CoinBTM, they insisted on a two-tiered corporate structure: (1) a licensing company (Zampella's wholly-owned company, Cottonwood); and (2) a management company (the jointly owned Blue Tree).

9. The reason for the bifurcated structure, Zampella, Russo and Basmaji explained, was that Zampella had already begun applying for a BitLicense, with Cottonwood as the business entity and only his name on the application. According to Zampella, adding new members to Cottonwood would require adding new people to the application, which might slow down the process. Zampella assured Taylor that this split structure would be temporary until CoinBTM secured a BitLicense.

10. Zampella's sole ownership of Cottonwood made an equal, three-way distribution of CoinBTM's profits complicated, but the partners agreed that an equal split could be achieved if most of CoinBTM's profits went to Blue Tree and if Taylor and Russo took a greater share of Blue Tree's profits.

11. So the partners agreed that CoinBTM would distribute 10% of its profits to Cottonwood (in which Zampella had a 100% stake) and 90%, to Blue Tree (in which Taylor and Russo each had a 37% stake and Zampella had a 22% stake).

12. Concerned with the casual nature of their agreement at the time, Taylor demanded that CoinBTM's partnership and profit distribution agreement be memorialized in a formal written agreement.

13. Zampella and Russo promised one would come but asked Taylor to trust them in the meantime.

14. For instance, on August 12, 2015, Pierre Basmaji, CoinBTM's attorney and a shareholder, promised Taylor on behalf of Zampella and Russo: "On my law license, I promise to you that we are working out the details to facilitate your partnership in the BTM business . . . . I hope to have the corporate structure finalized and formed by the end of the week that all three of you are a part of."

15. In reliance on these representations, Taylor contributed about $88,000 in startup capital to the venture. While Taylor wanted to make his contribution in Bitcoin, Zampella and Russo insisted on cash. So Taylor sold roughly 450 bitcoins on the market for cash and transferred about $88,000 in cash and wire transfers to Zampella and Russo.

16. Taylor then threw himself into the business: he assigned his valuable placement agreements and leases to the joint venture, replaced his BTMs with jointly purchased new BTMs,

scouted new locations, secured new placement agreements and leases, and installed additional BTMs.

17. Taylor was also the sole customer-facing technical representative, the lead on-site technician addressing BTM malfunctions, lead marketing officer (creating all marketing campaigns, promotions, logos, and solutions), and developed strategies to grow the business (such as a Bitcoin wallet application).

18. Taylor performed the overwhelming majority of the joint venture's business. In fact, the only portions of the business that Taylor did not tackle alone were (1) securing the BitLicense; (2) sourcing BitCoin for purchasing; and (3) server-side technical support.

19. And while Zampella, Basmaji, and Russo never followed through with a formal agreement, the parties continued as if their agreement was in place. Among other things, Taylor received about $3,000 per week in Bitcoin.

20. That is, until April 2016, when Zampella and Basmaji informed Taylor that (i) Zampella had discretion not to disburse CoinBTM profits to Blue Tree; (ii) Cottonwood would be severing its relationship with Blue Tree; and (iii) because Taylor only owned an interest in Blue Tree (but not Cottonwood), Taylor was essentially out of the business.

21. Cottonwood and CoinBTM was a wildly successful business because of Taylor's efforts. Defendants ousted him, then reaped the benefits of the venture he was responsible for.

22. This is an action to recover Taylor's one-third interest in CoinBTM, including one-third of all profits since April 2016, believed to exceed $100 million.

**PARTIES**

23. Robert Taylor is an individual residing in the State of New York.

24. Aniello Zampella is an individual residing in New York County.

25. Chad Russo is an individual residing in New York County.

26. Pierre Basmaji is an individual residing in Los Angeles County.

27. Cottonwood Vending, LLC, is a Texas limited liability company authorized to do business in New York.

28. Blue Tree Management LLC is a New Mexico limited liability company authorized to do business in New York.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over the defendants pursuant to CPLR §301, as they reside in or do business in New York.

30. Venue is proper in this Court pursuant to CPLR §503, as the defendants either reside in or have a principal office in New York County.

## FACTS COMMON TO ALL CAUSES OF ACTION

**Taylor Starts His BTM Business.**

31. Around 2014, Taylor started a business setting up digital kiosks called BTMs that served as "ATMs," where customers could buy or sell the virtual currency Bitcoin for cash at physical locations in New York City: typically, grocery stores and bodegas.

32. Taylor personally scouted the locations, executed leases with the storeowners, adapted, installed and managed the hardware, marketed the business, provided technical support for customers, and developed new avenues of the businesses.

33. In early 2015, Taylor received notice from the New York City Department of Financial Services (DFS) that individuals or entities in the business of receiving or transmitting virtual currency (like those operating BTMs) would require a "BitLicense."

34. Taylor had no experience in financial regulation; so he sought out partners.

**Taylor, Zampella and Russo Create a Joint Venture: CoinBTM.**

35. Taylor was introduced to Zampella and Russo through mutual contacts.

36. While Taylor brought the physical BTM locations and a well-developed customer base, Zampella and Russo were experienced virtual currency traders. They had capital and supposedly had contacts in the industry to manage the regulatory hurdles.

37. And in early 2015, Zampella had already started the process of obtaining a BitLicense through his wholly-owned company Cottonwood.

38. Over the course of several conversations held through in-person meetings in Zampella and Russo's office and conference calls, Zampella, Russo, and Taylor came to the following agreement: they would form a joint venture called CoinBTM to set up licensed BTMs in New York and elsewhere.

39. The agreement was simple: they would be 1/3 partners (not including smaller investors) in the venture. And profits would be distributed quarterly.

40. The structure was a little more complicated. Zampella and Russo insisted on a structure that split CoinBTM into two separate companies: Cottonwood and Blue Tree.

41. The reason, Zampella, Russo and CoinBTM's attorney Pierre Basmaji explained, was that Zampella was the only name on Cottonwood's pending application for a BitLicense. And if Taylor and Russo (or any other investors) joined that entity, it would restart the licensing efforts, a setback they could not afford. And because Zampella had submitted Cottonwood's application for a BitLicense before DFS's new regulatory cutoff for virtual currency ATMs, Cottonwood could operate BTMs under a provisional license in the meantime.

42. Zampella, Russo and Basmaji promised that once Cottonwood secured the BitLicense, Taylor and Russo would be submitted as additional names to the official BitLicense and added to Cottonwood's operating agreement as equal partners.

43. In the meantime, they would set up a waterfall distribution that effected the same one-third/one-third/one-third split. CoinBTM would send 10% of its profits to Cottonwood and 90% to Blue Tree (set up as CoinBTM's exclusive management company) which would have an ownership structure adjusted so that, after profits were distributed, each individual partner would receive equal amounts.

44. The agreed-upon corporate structure is reflected in the following organizational chart:



45. So for every $100 generated by CoinBTM: Taylor would receive $33.30. For taxation and liability purposes, Blue Tree would report a revenue of $90 and Cottonwood would report a revenue of $10.

46. The parties all executed Blue Tree's Operating Agreement reflecting this membership split.

47. But neither Zampella, Russo nor Basmaji ever signed a formal agreement memorializing the 90/10 split of CoinBTM's ownership between Blue Tree and Cottonwood.

48. Uncomfortable with the venture's lack of formality, Taylor asked repeatedly for a formal written distribution or exclusivity agreement formalizing Blue Tree and Cottonwood's relationship with CoinBTM.

49. Defendants assured Taylor it was coming. Indeed, on August 12, 2015, Pierre Basmaji, CoinBTM's attorney and a shareholder, promised Taylor on behalf of Zampella and Russo: "On my law license, I promise to you that we are working out the details to facilitate your partnership in the BTM business. . . . I hope to have the corporate structure finalized and formed by the end of the week that all three of you are a part of."

50. In reliance on these representations, Taylor contributed about $88,000 in startup capital to the venture. Taylor wanted to make his contribution in Bitcoin but Zampella and Russo insisted on cash. So Taylor sold about 450 bitcoins on the market for cash, and transferred about $88,000 to Zampella and Russo in cash and wire transactions

51. Taylor threw himself into the business. He assigned valuable placement agreements and leases to the joint venture, removed his active BTMs and replaced them with new jointly purchased BTMs, scoutedd new locations, secure new placement agreements and leases, and personally installed new BTMs.

52. Taylor also acted as the sole customer-facing technical representative, lead on-site technician for BTM malfunctions, lead marketing officer (creating all marketing campaigns, promotions, logos, and solutions), and developed new strategies to grow the business (such as creating a Bitcoin wallet app).

53. Over the next few months, CoinBTM operated as agreed for the most part. Taylor, Zampella and Russo agreed to pay themselves $3,000 a week either in physical cash or in Bitcoin from CoinBTM's revenue (Taylor opted to receive his salary in Bitcoin). But Zampella and Russo insisted on withholding disbursing profits (which should have made quarterly) until the end of the fiscal year.

54. In the meantime, Zampella and Cottonwood pursued the BitLicense.

**The Partnership Starts to Fracture**

55. At some point in late 2015 or early 2016, Taylor learned that Russo was a convicted felon.

56. Zampella and Basmaji knew this for years but never disclosed it to Taylor.

57. This alarmed Taylor. And Taylor's worst fears were realized when Russo stole approximately $274,000 of Bitcoin from CoinBTM in March 2015.

58. To his credit, Zampella mobilized quickly with Taylor to eject Russo as manager of Blue Tree on March 23, 2015, leaving Taylor as its sole manager.

**Defendants Illegally Oust Taylor from CoinBTM.**

59. But the dominoes continued to fall. In April 2016, after refusing to make any quarterly profit distributions, Defendants made their move to push Taylor out of CoinBTM.

60. Zampella and Basmaji first refused Taylor's request for formal documentation memorializing their 2015 joint venture agreement: *e.g.*, a written exclusive management agreement or a profit distribution agreement. Then they disavowed the joint venture entirely.

61. Leveraging the "two-company" business structure they had insisted on supposedly for licensing reasons, Zampella and Basmaji told Taylor that (i) he was not entitled to any of CoinBTMs profits as these would all go to Cottonwood; and (ii) Blue Tree had no value.

62. To add insult to injury, on April 21, 2016, Zampella, Basmaji and Russo then purported to vote to remove Taylor as manager of Blue Tree, and installed Basmaji as manager.

63. Finally, Cottonwood severed its relationship with Blue Tree.

64. Taylor never received another dime from Cottonwood, Blue Tree, or any of the individual defendants.

**CoinBTM Goes on To Realize Taylor's Vision as the Largest BTM Network in New York**

65. Having secured Taylor's initial contribution (and physical BTM locations) to get them off the ground, Zampella, Russo, and Basmaji grew CoinBTM into the largest BTM network in New York.

66. Operating under a provisional license for several years, Cottonwood (doing business as CoinBTM) obtained its BitLicense in January 2019.

67. Yet despite promising to do so, Zampella did not add Taylor to Cottonwood's operating agreement as a one-third member and did not submit Taylor as an additional name to the BitLicense.

68. Upon information and belief, CoinBTM has generated and distributed profits in excess of $100 million to Zampella, Russo, and Basmaji (among others) but has paid nothing to Taylor.

**Demand Would Be Futile**

69. Basmaji is the managing member of Blue Tree. And Russo and Zampella are, together, controlling members of Blue Tree.

70. It would be futile for Taylor to demand that Basmaji sue himself as managing member or that Russo and Zampella sue themselves as controlling shareholders.

71. Therefore, demand is not necessary for Taylor's derivative claims.

## FIRST CAUSE OF ACTION
### (Direct Breach of Contract as against Zampella, Russo, and Cottonwood)

72. Zampella, Russo, and Taylor intended to form a partnership to develop CoinBTM. To that end, they entered into a joint venture agreement to form, operate, and split the profits and losses of, CoinBTM.

73. In their agreement, Zampella, Russo, and Taylor agreed that, until Cottonwood secured its BitLicense, CoinBTM would distribute its profits and assets as follows: 10% would go to Cottonwood; and 90% to Blue Tree, to be distributed further (and ultimately to Taylor) in accordance with Blue Tree's operating agreement.

74. All in all, the parties agreed that Taylor would ultimately have a 1/3 interest in CoinBTM to be paid in quarterly distributions through Blue Tree.

75. In addition, the parties agreed that once Cottonwood secured a BitLicense, the venture would drop the "two-company" structure and add Taylor directly as a one-third partner of Cottonwood.

76. Taylor performed all his obligations under this agreement.

77. Zampella, Russo, and Cottonwood breached this agreement by, among other things, (1) severing Cottonwood's relationship with Blue Tree in April 2016; (2) refusing to distribute 90% of CoinBTM's profits to Blue Tree, and ultimately, to Taylor for his 1/3 interest; (3) upon Cottonwood's securing a BitLicense in January 2019, refusing to amend the operating agreement to give Taylor a direct 1/3 interest.

78. As a direct and proximate result of this breach, Taylor has been, and continues to be, damaged in an amount to be proven at trial, but believed to be in excess of $100 million.

## SECOND CAUSE OF ACTION
### (Derivative Breach of Contract as against Zampella, Russo, and Cottonwood)

79. In exchange for its members' initial investment and performing the management end of the business, Zampella, Russo and Cottonwood agreed to split CoinBTM's profits 10% to Cottonwood; 90% to Blue Tree.

80. Blue Tree performed all its obligations under this agreement.

81. Zampella, Russo, and Cottonwood breached this agreement by, among other things, (1) severing Cottonwood's relationship with Blue Tree in April 2016; and (2) refusing to distribute 90% of CoinBTM's profits to Blue Tree, and ultimately, to Taylor for his 1/3 interest.

82. As a direct and proximate result of this breach, Blue Tree has been, and continues to be, damaged in an amount to be proven at trial, but believed to be in excess of $100 million.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment against Zampella, Russo, and Cottonwood)

83. If this Court determines that a joint venture to form CoinBTM was never formed, Plaintiff pleads the following quasi-contract allegations in the alternative.

84. Taylor, by himself and through Blue Tree, scouted BTM locations, negotiated leases, managed physical BTM locations for CoinBTM, provided a well-developed customer base, acted as main customer support, produced all marketing campaigns and developed all ancillary businesses.

85. Taylor also paid $88,000 in furtherance of the joint venture.

86. These efforts and investments were for the direct benefit of Zampella, Russo, Cottonwood, and the joint venture.

87. Zamella, Russo and Cottonwood received and consented to this benefit and at Taylor's expense.

88. Equity and good conscience require that Zampella, Russo and Cottonwood not be entitled to receive the benefit of these efforts require that they pay restitution to Taylor.

### THIRD CAUSE OF ACTION
### (Fraud as against Zampella, Russo, and Basmaji)

89. In inducing Taylor to commit his know-how, physical BTM locations, customer base and $88,000 investment to their efforts in developing CoinBTM, Zampella, Russo, and Basmaji represented to Taylor that he would receive one-third of the joint venture's profits.

90. Among other statements, on April 12, 2015, Basmaji, on behalf of Zampella and Russo, represented to Taylor "on his law license" that he would get Taylor the necessary documentation to ensure his comfort as a one-third partner in the CoinBTM joint venture.

91. Zampella and Russo made similar oral and written representations in March and April 2015.

92. Taylor relied on these representations in executing the Blue Tree Operating Agreement, giving his money to defendants, transferring previously negotiated lease agreements, sharing trade secrets and bringing in his customer base to the joint venture.

93. These representations were knowingly false. Zampella, Russo and Basmaji structured CoinBTM deliberately to oust Taylor when convenient. They never intended to send a formal writing acknowledging his partnership interest. And their plan all along was to solicit his investment, take over his BTM locations, poach his customers, acquire his trade secrets, and then cut him out of the business.

94. As a direct and proximate cause of Zampella, Russo, and Basmaji's misrepresentations, Taylor lost out of tens or hundreds of millions of dollars in profits, in addition to his out-of-pocket investment.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty as against Zampella and Russo)

95. Zampella, Russo, and Taylor entered into a joint venture agreement.

96. As a member of a partnership, Zampella and Russo owed Taylor fiduciary duties of honesty and loyalty.

97. Zampella and Russo breached these duties when (i) Russo stole over $200,000 from CoinBTM; (ii) Zampella refused to report this theft; (iii) Zampella and Russo cut Blue Tree and Taylor out of the joint venture; (iv) they failed to disclose Russo's criminal history; and (iv) Zampell and Russo distributed profits from CoinBTM to themselves instead of to Taylor.

98. As a direct and proximate result of Zampella and Russo's breaches, Taylor has been, and continues to be, damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Accounting Against All Defendants)

99. As joint venture partners, and as managers and shareholders of Blue Tree, Defendants owe Plaintiffs a duty of trust and performance to account for the profits earned through the CoinBTM joint venture and to maintain the information and records necessary to verify the calculations of such profit distributions.

100. Defendants have failed to make such accounting.

101. Plaintiffs have no adequate remedy at law because Defendants are in sole possession of such information and records.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

i. On Plaintiff's First Cause of Action, damages in an amount to be determined at trial;

14

    ii. On Plaintiff's Second Cause of Action, damages in an amount to be determined at trial;

    iii. On Plaintiff's Third Cause of Action, damages in an amount to be determined at trial;

    iv. On Plaintiff's Fourth Cause of Action, damages in an amount to be determined at trial;

    v. On Plaintiff's Fifth Cause of Action, an accounting; and

    vi. Such other and further relief as this Court may deem just, proper, and equitable, together with the costs and disbursements of this action.

Dated: New York, New York
February 22, 2022

**TUTTLE YICK LLP**

By:   /s/ Gregory O. Tuttle
Gregory O. Tuttle
David G. Skillman
352 Seventh Avenue, 14th Floor
New York, New York 10001
(646) 833-0300

*Attorneys for Plaintiff*